**Opinion issued April 30, 2026**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-25-00251-CV**

———————————

**SCI TEXAS FUNERAL SERVICES, LLC D/B/A MEMORIAL PARK AND DM AFFINITY, INC., Appellants**

**V.**

**RANDALL LAWHON, BRODY LAWHON, AND HEATHER LYNN, Appellees**

---

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-40226**

---

## MEMORANDUM OPINION

This dispute about arbitrability involves allegations that a funeral home—SCI

Texas Funeral Services, LLC *d/b/a* Memorial Park and DM Affinity, Inc.

(collectively, "SCI")—mistakenly buried someone in a spot that was already promised to someone else. The burial took place under a 2022 interment contract that has an arbitration clause, but when the problem arose two years later, the family and the company signed a 2024 reinterment agreement with no arbitration clause.

The family (Randall Lawhon, Brody Lawhon, and Heather Lynn) sued the company for its 2022 conduct in "[r]epresenting" that the plot was available, in "[n]egligently allowing" the deceased to be "buried in a plot that was previously sold," in "[f]ailing to train employees on identifying previously sold plots," and in "[f]ailing to properly bury" the deceased. The trial court declined to send the case to arbitration.

We have seen this contractual arbitration language before. Last year we upheld an order compelling arbitration in a case that involved the same company, SCI Texas Funeral Services. *See Masterson v. SCI Tex. Funeral Servs., LLC*, No. 01-23-00496-CV, 2025 WL 2165176 (Tex. App.—Houston [1st Dist.] July 31, 2025, no pet.) (mem. op.). The arbitration provision at issue in *Masterson* is virtually identical to the provision at issue in the 2022 interment agreement that Lawhon and SCI signed. This provision is broad and calls for arbitration under the applicable rules of the American Arbitration Association.

In *Masterson*, we ruled that "the parties clearly and unmistakably delegated gateway issues of arbitrability to the arbitrator, including the validity and scope of

2

the arbitration clause." *Id.* at *7. "Accordingly, the trial court had no discretion but to compel arbitration in this case." *Id.* Although *Masterson* had not yet issued when the parties in this case wrote their briefing, its analysis resembles the analysis advanced here by SCI.

The family sees things differently. The family emphasizes that these parties made two agreements, not one. Yes, they say, the first agreement (signed in 2022) does have an arbitration clause, but the second agreement (signed in 2024) shows that the parties struck out the arbitration clause and initialed the strikeouts. In the family's view, the second agreement replaced the first one.

SCI concedes that the second agreement has the arbitration clause struck out. But SCI says that the family is not suing on the second agreement, which simply involved reinterment to a different location as a way to resolve the predicament. Instead, the family sued on the initial agreement, complaining that SCI had already promised the same spot to somebody else, which is what created the predicament and required the reinterment to take place two years later.

Did the second contract replace the first one and thereby remove the promise to arbitrate the claims asserted here? After studying the contract's language closely, we answer that question no. The second contract deals only with the reinterment, not the initial interment. We therefore reverse.

## Background

The parties essentially agree on the relevant facts. Sharon Lawhon passed away in March 2022, at the age of sixty. A few days later, her husband Randall Lawhon signed an agreement with SCI.

### A. The 2022 Agreement

This 2022 agreement, which has a footer reading "Form 202-TX (09/18)," calls for arbitration:

> ARBITRATION: Purchaser agrees that any claim he/she may have relating to the transaction contemplated by this Agreement (including any claim or controversy regarding the interpretation of this arbitration clause) shall be submitted to and finally resolved by mandatory and binding arbitration in accordance with the applicable rules of the American Arbitration Association ("AAA") . . . .

(Emphasis omitted.) The agreement contains a notice directly above Lawhon's signature: "By signing this Agreement, Purchaser is agreeing that any claim Purchaser may have against the Seller shall be resolved by arbitration and Purchaser is giving up his/her right to a court or jury trial as well as his/her right of appeal."

The 2022 agreement also contains an entire agreement clause, which refers to a Schedule A:

> ENTIRE AGREEMENT: This Agreement contains all terms which have been agreed upon by the Purchaser and the Seller relating to the goods and services listed on Schedule A. This Agreement replaces all other discussions and agreements, whether oral or written, relating to those goods and services. No subsequent discussion or agreement can change the terms of this Agreement unless it is written and is signed by both the Purchaser and the Seller (or the Seller's assignee).

4

(Emphasis omitted.) Schedule A comes on the last page of the contract, and it lists the goods and services selected. Here the parties selected "Interment – Adult Double Depth" and stated the price to be paid.

**B.     The 2024 Agreement**

The second agreement is dated in March 2024. The printed form varies from the Form 202-TX in several places. Although it contains some clauses that the 2022 agreement does not contain, the arbitration clause is identical. However, as noted earlier, the parties struck out the arbitration clause and initialed the strikeouts.

On the other hand, the parties did not strike out the entire agreement clause. This clause is substantively identical to the entire agreement clause in the 2022 agreement and reads as follows:

> ENTIRE AGREEMENT: This agreement contains all terms which have been agreed upon by the Purchaser and the Seller relating to the goods and services listed in "Schedule A." This contract replaces all other discussions and agreements, whether oral or written, relating to those goods and services. No subsequent discussion or agreement can change the terms of this contract unless it is written and is signed by both the Purchaser and the Seller (or the Seller's assignee).

(Emphasis omitted.) As with the first contract, the last page of the second contract is Schedule A, which lists the goods and services selected. Here the parties wrote, "2nd Right of Interment."

5

## C.    The Trial Court Proceedings

About three months after the parties executed the 2024 agreement, the family filed suit. The live pleading alleges that SCI committed a "colossal error" in "selling this resting place to another family." It asserts a claim for negligence in representing that the location was available, in negligently allowing Sharon Lawhon to be buried in a plot that was previously sold, and in failing to train employees on identifying previously sold plots.

Additionally, the live pleading alleges violations of the DTPA: "Defendants' unconscionable conduct and violations create a cause of action under the DTPA, particularly with respect to Defendants' failure to properly bury Ms. Lawhon. Failing to properly bury Ms. Lawhon, as was the case here, directly flies in the face of these legal protections to consumers such as Plaintiffs." The family specifically alleges five violations of the DTPA, including "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," breach of an express or implied warranty, and an unconscionable action or course of action.

SCI moved to compel arbitration. The trial court held a hearing on the motion, and after each side had presented arguments, the court asked SCI one question: "What about the language that says that this contract replaces all of the discussions and agreements, whether oral or written, related to those goods and services?" SCI

6

responded that the 2024 agreement was the entire agreement about the reinterment, but not about the initial interment. The trial court was unpersuaded and denied the motion to compel arbitration.

This interlocutory appeal followed.

**Arbitrability of Lawhon's Claims**

The controlling legal principles grow mainly out of the law of contract, as supplemented by statutes that require arbitration clauses to be treated on an equal footing with other contract provisions. *See, e.g.*, 9 U.S.C. § 2 (stating that written contractual provision to settle controversy arising out of such contract by arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); Tex. Civ. Prac. & Rem. Code § 171.001 (similar). Thus, these legal principles are certainly familiar, if not elementary.

**A.    Applicable Legal Principles**

We review an order denying a motion to compel arbitration for abuse of discretion. *See Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018); *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 642–43 (Tex. 2009) (orig. proceeding). But a court's failure to analyze or apply the law correctly constitutes an abuse of discretion, because a trial court never has discretion to get the law wrong or to misinterpret the language of a contract. *See Walker v. Packer*, 827 S.W.2d 833, 840

7

(Tex. 1992) (orig. proceeding) (stating that trial court's "erroneous interpretation of the law constitutes a clear abuse of discretion").

Accordingly, the standard of review here becomes de novo because we construe unambiguous contracts as a matter of law. *See Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). In other words, de novo review applies both to a trial court's determination regarding whether a valid agreement to arbitrate exists and also to the court's construction of an unambiguous agreement. *See In re Labatt Food Serv.*, 279 S.W.3d at 643 ("Whether an arbitration agreement is enforceable is subject to de novo review.").

The de novo component fits with the fact that courts treat arbitration as a matter of contract: "Under the [Federal Arbitration Act], arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019). Arbitration agreements are placed "on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006), and must be enforced "according to their terms," *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010).

This fact in turn has a consequence for the issue of who decides what. Parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. *Henry Schein*,

586 U.S. at 67–68; *TotalEnergies E&P USA, Inc. v. MP Gulf of Mex., LLC*, 667 S.W.3d 694, 702 (Tex. 2023); *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 631 (Tex. 2018).

When parties contractually agree to delegate any arbitrability disputes to the arbitrator—as SCI claims to have taken place here—courts must enforce that agreement just as they must enforce an agreement to delegate resolution of the underlying merits to the arbitrator. *See RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 121 (Tex. 2018).

So for SCI's argument to function, there must be clear and unmistakable evidence of delegation: courts will enforce an agreement to delegate arbitrability to the arbitrator only if the agreement is "clear and unmistakable." *TotalEnergies*, 667 S.W.3d at 702 (quoting *Robinson v. Home Owners Mgmt. Enters., Inc.*, 590 S.W.3d 518, 525, 532 (Tex. 2019)). The "clear and unmistakable" standard will be met by an agreement to abide by AAA rules: "[A]s a general rule, an agreement to arbitrate in accordance with the AAA or similar rules constitutes a clear and unmistakable agreement that the arbitrator must decide whether the parties' disputes must be resolved through arbitration." *Id.* at 708.

Everyone agrees that the arbitration clause in the 2022 interment agreement called for arbitration under the AAA rules. The AAA has more than one set of rules, and it amends those rules from time to time, but we believe that the proper set would

9

be the consumer rules promulgated in 2014. Under Rule R-14 of those rules,[1] the arbitrator decides questions of validity and scope:

> R-14. Jurisdiction
>
> **(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.
>
> **(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.
>
> **(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the award.

With all these legal principles in mind, we now apply them as we turn to the language of the two contracts.

## B. Application to the Two Contracts

The 2022 interment agreement plainly calls for arbitration, and by adopting the AAA rules it would seem to delegate the issue of arbitrability to the arbitrator just as occurred in *TotalEnergies*. The only possible caveat on this conclusion comes

---

[1] *See* AM. ARB. ASS'N, Consumer Arbitration Rules R-14 (effective Sep. 1, 2014), *available at* https://www.adr.org/media/uzyczmou/consumer-rules.pdf (last visited Apr. 27, 2026).

from the 2024 reinterment agreement, which might override the 2022 agreement's terms because of the entire agreement clause. Under that provision, the 2024 agreement replaces all other agreements "relating to" the goods and services on the document's Schedule A.

Can the initial interment, with its apparent error, fairly be described as "relating to" the reinterment? The family made an argument to that effect during the hearing on the motion to compel arbitration. On the other hand, SCI argues to the contrary. In SCI's view, the 2022 agreement and the 2024 agreement coexist without difficulty, in that they address two distinct things (namely, interment and reinterment).

Who decides the legal consequence of there being two contracts? Under the U.S. Supreme Court's recent decision in *Coinbase v. Suski*, that question falls to the courts, at least to the extent that it requires a decision on the threshold issue of whether the initial arbitration clause survives:

> In cases where parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration. But, where, as here, parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs.

*Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024). Any contrary conclusion would impermissibly elevate delegation provisions above all other forms of contract

provisions. *Id.*; *Cerna ex rel. R.W. v. Pearland Urb. Air, LLC*, 714 S.W.3d 585, 591 (Tex. 2025) ("A subsequent agreement may also require a court to decide whether the prior agreement containing a delegation provision remains in existence . . . ."); *Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 480 (Tex. 2022) ("Because the parties here dispute whether their arbitration agreement continued to exist after the 2012 settlement agreement, we agree with the trial court and court of appeals that courts must decide that issue.").

We hold that the arbitration clause from 2022 remains in existence. When the parties made the second agreement in 2024, they could easily have stated that they were scrapping the first deal and replacing it entirely with a new agreement. Or they could easily have said something narrower, such as that they were changing their minds about the arbitration clause and had opted to do away with it for all possible disputes. Lawhon submitted an affidavit where he stated that the parties had such a desire by the time they entered the second agreement, so writing down those wishes certainly would not have been difficult.

But the parties did not do that. They did not write down any of the matters alleged by Lawhon in that affidavit. Instead, they provided—in the entire agreement clause—that the 2024 agreement replaced only other agreements "relating to" the goods and services listed in Schedule A. The only services in Schedule A were the following: "2nd Right of Interment." Accordingly, the 2024 agreement did not

replace the 2022 agreement. *See Valerus Compression Servs., LP v. Austin*, 417 S.W.3d 202, 210–11 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (concluding that later agreement without arbitration clause did not replace earlier agreement with arbitration clause and stating that "[t]he mere presence of venue and merger provisions [in the later agreement] does not invalidate an arbitration agreement when the provisions can be harmonized with the agreement to arbitrate"). Rather, they can coexist.[2]

---

[2] We do not agree with Lawhon that a novation occurred when the parties signed the 2024 agreement. *See N.Y. Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 214 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ("Novation is the substitution of a new agreement between the same parties or the substitution of a new party on an existing agreement."). "The substitution of a new agreement occurs when a later agreement is so inconsistent with a former agreement that the two cannot subsist together." *In re B.N.L.-B.*, 523 S.W.3d 254, 264 (Tex. App.—Dallas 2017, no pet.) (quotation omitted). These principles apply in the arbitration context: parties to an arbitration agreement may agree to modify, supersede, or delay the arbitration agreement. *Beldon Roofing Co. v. Sunchase IV Homeowners' Ass'n, Inc.*, 494 S.W.3d 231, 242 (Tex. App.—Corpus Christi–Edinburg 2015, no pet.); *see Adcock v. Five Star Rentals/Sales, Inc.*, No. 04-17-00531-CV, 2018 WL 1831646, at *2–3 (Tex. App.— San Antonio Apr. 18, 2018, no pet.) (mem. op.) (concluding that pre-suit letter informing defendant that its failure to produce arbitration agreement within specified time would be agreement to resolve dispute in court rather than in arbitration and defendant's lack of response to letter constituted "a subsequent agreement to not arbitrate this dispute"); *TransCore Holdings, Inc. v. Rayner*, 104 S.W.3d 317, 323 (Tex. App.—Dallas 2003, pet. denied) (concluding that "very broad" release language in subsequent agreement between parties "unconditionally released the parties from all previous obligations," including obligation in initial agreement to arbitrate any claim or controversy arising out of that agreement).

Here, the 2022 agreement and the 2024 agreement concern separate subjects: the 2022 agreement concerns Sharon Lawhon's initial interment, and the 2024 agreement concerns her reinterment. The 2024 agreement did not modify or supersede the 2022 agreement, nor is it "so inconsistent with" the 2022 agreement

The family emphasizes the allegations in Lawhon's affidavit. They argue that his assertions are undisputed and thus carry the day. In their view, "the only evidence this Court has is Mr. Lawhon's uncontested sworn statement testifying he 'did not agree to waive my right to a trial by jury' and that Appellants removed the arbitration clause."

The affidavit, however, is not evidence at all when it comes to contract interpretation. People put contracts in writing for a reason, which is to prevent these kinds of later debates about who meant what. Under the parol evidence rule, we start with the contractual language, not one side's later account of what people were supposedly thinking and trying to do. *See Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 153 n.5 (Tex. 2020) ("[T]he parol evidence rule prohibits extrinsic evidence of *subjective* intent.") (quotation omitted); *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 749 (Tex. 2020) (stating that parol evidence rule prohibits courts from relying on extrinsic evidence such as surrounding circumstances "to augment, alter, or contradict the terms of an unambiguous contract" or to "show that the parties probably meant, or could have meant, something other than what their agreement stated") (quotations omitted). Where the written words are unambiguous, as here, those words control. *See Endeavor Energy*

---

that the two agreements "cannot subsist together." *See In re B.N.L.-B.*, 523 S.W.3d at 264.

14

*Res.*, 615 S.W.3d at 153 n.5 (stating that subjective intent only becomes relevant after court has determined contract is ambiguous).

Here the words of the two contracts unambiguously provide for the parties to arbitrate (under AAA rules) disputes relating to the initial interment, but not the reinterment. By incorporating the AAA rules in the 2022 agreement's arbitration provision, the parties clearly and unmistakably delegated gateway questions of arbitrability—including whether the arbitration provision covers Lawhon's claims— to the arbitrator. We hold that the trial court erred by denying SCI's motion to compel arbitration.

## Conclusion

We reverse the order denying SCI's motion to compel arbitration. We direct the trial court to enter an order compelling arbitration and staying the trial court proceeding pending completion of the arbitration. Our stay imposed on February 11, 2026, shall terminate upon issuance of the mandate.

David Gunn
Justice

Panel consists of Justices Gunn, Caughey, and Morgan.